IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LINDA WILSON ) | |
| ) | |
| v. ) | No. 3:09-0892 |
| ) | Judge Wiseman/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 18), to which defendant has responded (Docket Entry No. 23). Further replies and responses have also been filed. (Docket Entry Nos. 24, 27, 28) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 12),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED, and that the decision of the SSA be AFFIRMED.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff protectively filed her DIB and SSI applications in October 2004, alleging disability beginning in April 2003. These applications for benefits were denied at the initial and reconsideration stages of agency review, whereupon plaintiff requested a de novo hearing before an Administrative Law Judge ("ALJ"). An ALJ hearing was held on December 19, 2007, when plaintiff appeared with counsel and gave testimony. Testimony was also received from an impartial vocational expert. (Tr. 910-53) At the conclusion of the hearing, the ALJ took the matter under advisement until January 24, 2008, when he issued a written decision finding plaintiff not disabled and denying her applications for benefits. (Tr. 18-36) The ALJ's decision contains the following enumerated findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since February 18, 2004 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. Since February 18, 2004, the claimant's "severe" impairments have been alcohol dependence and a seizure disorder; as of February 1, 2007, such impairments also included degenerative disc disease of the cervical spine (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant has not had an impairment or combination of impairments that has met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, which is also called the Listing of Impairments (20 CFR 404.1520(d) and 416.920(d)).
>
> 5. From February 18, 2004, to February 1, 2007, the claimant could have performed work at any level of exertion with allowances for seizure precautions; for avoiding work that requires changes in work requirements or procedures, any significant amount of attention or concentration, or any work-related decisions; and for understanding, remembering, and carrying out

only one or two-step instructions. As of that latter date, she could perform a light level of exertion with those same allowances.

6. The claimant could not perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Born July 21, 1964, the claimant was 39 years old on February 18, 2004. Thus she was a "younger individual," not younger than eighteen or older than forty-nine years of age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education with the ability to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568 and 416.968).

10. Considering her age, education, work experience, and residual functional capacity, *along with her substance addiction disorder*, there are no jobs existing in significant numbers in the national economy that the claimant is capable of performing (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. If the claimant stopped the use of substances, the remaining exertional limitations would cause more than a minimal impact on her ability to perform basic work activities; therefore, she would still have had a "severe" impairment.

12. If the claimant stopped using substances, she does not have any impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

13. In the absence of substance use, from February 18, 2004, to February 1, 2007, she could have performed work at any level of exertion with an allowance for seizure precautions. As of that latter date, she could perform a light level of exertion with the same allowance.

14. If she stopped the substance use, the claimant still could not perform any of her past relevant work since February 18, 2004 (20 CFR 404.1565 and

416.965).

15. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

16. In the absence of the substance use, and considering her age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

17. Because she would not be disabled if she stopped the substance use (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance use disorders is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935). Thus, the claimant has not been disabled with the meaning of the Social Security Act at any time from February 18, 2004 through the date of this decision.

(Tr. 28-35)

On July 25, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 5-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record[2]

Wilson experienced seizures since her early 20s (Tr. 313, 769, 775, 868). She was prescribed anticonvulsant medication, generally Dilantin (also known as phenytoin), in

---

[2]The following record review is taken from defendant's brief. (Docket Entry No. 23 at 3-7)

1996, and she worked many years despite her seizures (Tr. 126, 310). She reported experiencing up to several seizures per week, although there were occasions when she reported no seizures (Tr. 294-99, 635-50, 775-76, 818-23, 867, 885-89). Wilson visited the emergency room due to injuries resulting from her seizures, although many of these visits also involved alcohol (Tr. 454-56, 470, 483-99, 503-06, 613-18).

Wilson was not compliant in taking her medication. David Johnson, M.D., and Jacqueline Peters, a certified nurse practitioner, Wilson's primary care sources, often stated or suspected that Wilson was not taking her medication (Tr. 636, 642, 644, 646, 653, 656). Emergency room physicians and other medical sources also stated that Wilson was not taking her medication (Tr. 495-99, 513, 694, 720, 760). Blood tests confirmed that Wilson's phenytoin level was consistently below the normal range of 10-20 — many times, in fact below 3 (Tr. 328-29, 331, 333-34, 374, 458, 590, 674, 684-85, 689, 692, 694, 729, 802, 826, 828).

Wilson was diagnosed with alcohol abuse since, at least, 1997 (Tr. 769). Wilson drank beer daily — varying from less than 1 can (8 ounces) to 6 to 12 cans — and vodka occasionally, although she reported that she stopped drinking vodka (Tr. 341, 343, 378, 404, 470, 507, 655, 707, 774, 818, 820, 822, 832, 836A, 870-71). Anthony Montemuro, M.D., questioned whether Wilson was honest about her alcohol use; he stated in January 2005 that Wilson "continue[d] to drink, although exactly how much she is drinking is unclear to me" because "[s]he is not really straightforward about this" (Tr. 339). Nurse Peters also "suspect[ed] more drinking than [Wilson] admit[ted] too" (Tr. 653). Wilson visited the emergency room on multiple occasions due to accidents involving alcohol (Tr. 464-70, 480, 486-93, 507, 509-14, 759-61). At several of these emergency room visits, blood tests showed

5

an alcohol level over 300, where the normal range is 0-10 (Tr. 481, 490, 510, 756, 761).

Wilson was "arrested multiple times for public intoxication" (Tr. 870-71). Wilson "did not know how many times in all, stating that there were too many to count" (Tr. 871).

Wilson kept drinking despite being informed on numerous occasions about the interaction between alcohol and her medication. Warren McPherson, M.D., stated in August 1997 that he informed Wilson that "every time she took a drink of alcohol she increased her changes (sic) of having another seizure" (Tr. 769). Thomas Privett, M.D., instructed Wilson to stop drinking in October 2001 because "(1) it does not go well with seizure disorders; (2) it does not go well with antiseizure medication" (Tr. 777). Dr. Montemuro stated in January 2005 that Wilson "really just needs to stop alcohol, as difficult as this may be, particularly since she is taking Dilantin" (Tr. 340). Dr. Johnson and Nurse Peters often instructed Wilson to stop drinking (Tr. 642, 649, 655, 660). When Nurse Peters asked Dr. Johnson about the medication to prescribe to Wilson, Dr. Johnson stated that there were "not a lot of good option with [Wilson's] alcoholism" (Tr. 650). Emergency room physicians also instructed Wilson to avoid alcohol (Tr. 491, 511).

Electroencephalograms (EEG) of the brain have been unremarkable. An October 2001 EEG was normal and showed no "evidence of focal or epileptiform abnormalities" (Tr. 743, 777). An EEG in June 2005 also showed "no activation of epileptiform activity" (Tr. 479, 775).

Radiological images showed no to mild brain atrophy. An MRI in September 1997 showed some brain atrophy (Tr. 768). A CT scan of November 2005 showed "mild atrophy" but "no acute intracranial process evident" (Tr. 463). But two more recent CT scans

6

(March 2006 and February 2007) were negative (Tr. 632A, 754).

Nathaniel Robinson, M.D., a state agency physician, opined in January 2005 that Wilson's "seizure disorder should respond to compliance with treatment and abstinence from alcohol" (Tr. 366). Dr. Robertson based this conclusion on Wilson's noncompliance in taking her medication and a CT scan showing no more than mild atrophy (Tr. 366).

That same month, Nurse Peters opined that Wilson could "work with restrictions at this time, however she would require transportation as she is not able to drive due to her current health problems" (Tr. 647).

Jeffrey Viers, L.P.E., a psychologist, opined in April 2005 that Wilson's inability to work appeared "more likely due to her personality structure and alcohol abuse behaviors" rather than due to mental illness (Tr. 382). Dr. Viers stated that Wilson smelled "slightly of alcohol on her breath" (Tr. 382). Dr. Viers stated that Wilson's immediate recall was intact and her long-term memory was fair, although her short-term memory was more impaired (Tr. 379). Although Wilson's thought process seemed circumstantial and convoluted, she was able to follow a simple, three-stage command (Tr. 379-80). Dr. Viers estimated that Wilson had low average to borderline intellectual functioning (Tr. 382). Dr. Viers stated that Wilson's "test results suggest[ed] a dramatic and exaggerated response style" (Tr. 382). Dr. Viers diagnosed a personality disorder not otherwise specified alcohol abuse with a rule out diagnosis of alcohol dependence (Tr. 383).

Rebecca Hansmann, Psy.D., a state agency psychologist, opined in May 2005 that Wilson did not have a severe mental impairment (Tr. 420-433). Dr. Hansmann noted that Wilson "smelled slightly of alcohol at [Dr. Viers's] evaluation" and had an "exaggerated response style-questionable reliability of report" (Tr. 432). Dr. Hansmann noted that Wilson

7

could "generally complete [activities of daily living] effectively from a [mental health] standpoint" (Tr. 432).

Dr. Johnson opined in January 2006 that Wilson's alcohol abuse and noncompliance in taking her medication affected her seizure disorder (Tr. 620-23). Dr. Johnson stated that Wilson's alcohol abuse interacted with her anticonvulsant medication and "may lower [seizure] threshold —[increase] seizure activity" (Tr. 623). Dr. Johnson also stated that "compliance has been an issue, both from ability to get [medications] as well as following specific directions" (Tr. 622). Dr. Johnson reported that Wilson "often missed doses" (Tr. 622). Dr. Johnson stated that Wilson had been diagnosed with nonconvulsive epilepsy for years (Tr. 621).

Marvin Niebauer, M.D., opined in March 2007 that Wilson should follow seizure precautions, which meant that Wilson was unable to drive or do anything that could endanger herself (Tr. 776).

Deborah Doineau, Ed.D., examined Wilson one month before the administrative hearing at the request of Wilson's counsel (Tr. 866-81). Dr. Doineau stated that there were "some discrepancies between [Wilson's] report and information provided in records, especially regarding aspects of her substance abuse" (Tr. 867). Dr. Doineau stated that it was "quite possible that [Wilson] did not recall some events from her past" due to her ongoing alcohol abuse, seizures, and mild brain atrophy (Tr. 867). Dr. Doineau stated that Wilson's memory "seemed below average but not significantly impaired" (Tr. 873). Wilson had a mildly anxious mood and a full affect (Tr. 873). Wilson denied any delusions, hallucinations, or suicidal ideations (Tr. 873-74). Wilson had normal psychomotor abilities, somewhat limited insight, and very questionable judgment (Tr. 874). Based on the

8

examination and intelligence tests, Dr. Doineau stated that Wilson had "lower cognitive functioning, but not necessarily as having mental retardation" (Tr. 880). Dr. Doineau stated that these findings were consistent with Wilson's alcohol abuse and mild brain atrophy, which is "common in chronic alcoholics" (Tr. 879). Dr. Doineau diagnosed "alcohol dependence, reported to be in early partial remission" and "dementia not otherwise specified versus cognitive disorder [not otherwise specified]" (Tr. 880). Dr. Doineau stated that Wilson had a moderate limitation in her ability to understand and remember; a marked limitation her concentration, persistence, and pace; a mild limitation in her social functioning; and a moderate limitation in her adaptability (Tr. 880-81). Dr. Doineau stated that Wilson was not capable of managing her benefits due to alcoholism (Tr. 881).

Dr. Montemuro and Sunil Sarvaria, M.D., diagnosed alcoholic hepatitis/alcoholic liver disease in late 2004/early 2005 after blood tests showed elevated liver function results (Tr. 339-342, 376). Dr. Sarvaria's examination showed "no stigmata of chronic liver disease" (Tr. 376). There is no evidence that Wilson sought additional treatment from Dr. Montemuro or Dr. Sarvaria.

Wilson visited the emergency room in February 2007 with complaints of left shoulder pain (Tr. 737, 760-61, 763). Wilson denied any recent accident, but a blood test revealed an alcohol level of 300 (Tr. 761, 763). An MRI of the left shoulder showed a "downsloping acromion at the AC joint which could cause impingement on the underlying supraspinatus muscle and tendon" (Tr. 755). The attending physician diagnosed a shoulder sprain (Tr. 739). The physician recommended over-the-counter pain medication and the use of a sling and ice pack (Tr. 739). There is no indication that Wilson sought additional treatment for shoulder pain.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE")

11

testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to find severe, or otherwise consider the functional effects of, her brain atrophy, cognitive impairment NOS, alcohol liver disease, and left shoulder condition.  Plaintiff claims that "[t]he ALJ did not even discuss Ms. Wilson's brain atrophy, alcoholic liver disease and left shoulder condition, much less give a single reason for failing to find these conditions to be 'severe.'" (Docket Entry No. 18 at 21)  However, as pointed out by defendant, the ALJ did discuss the impairment of alcoholic liver disease (also referred to in the record as alcoholic steatohepatitis, or simply hepatitis) and plaintiff's possible left shoulder impingement, finding the former to be a nonsevere impairment because it was asymptomatic and plaintiff sought limited treatment for it, and finding the latter to be insufficiently developed in the evidence, outside of one x-ray in February 2007, to support any severe left shoulder impairment.  (Tr. 29)  Similar to this left shoulder impingement, the references in the record to mild brain atrophy appear to merely reflect a laboratory finding which was not correlated, when recorded, with any medically determinable impairment subject to analysis at step two of the sequential

12

evaluation process.  While Dr. Doineau correlated such mild atrophy with the "progressive cognitive decline" which she interpreted from plaintiff's psychometric test scores in late 2007, and which she subsequently quantified with her diagnosis of "dementia not otherwise specified versus cognitive disorder NOS (probably secondary to chronic alcohol usage)" (Tr. 879-80), the undersigned finds no error in the ALJ's failure to treat plaintiff's mild brain atrophy as an independent impairment.

As to Dr. Doineau's diagnosis of dementia NOS versus cognitive disorder NOS, the ALJ, having identified other severe impairments which advanced the inquiry further into the sequential evaluation process, and having considered the functional effects of any such impairments at those latter steps of the process, did not err in failing to recognize such impairment as severe for purposes of step two.  See, e.g., Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).  Specifically, the ALJ considered the functional effect of plaintiff's dementia/cognitive disorder when he found that the coexisting, severe impairment of alcohol dependence posed, e.g., marked difficulties in maintaining concentration, persistence, or pace, such that plaintiff was required to "avoid[] work that requires changes in work requirements or procedures, any significant amount of attention or concentration, or any work-related decisions," and work which requires understanding, remembering, and carrying out more than one- or two-step instructions.  (Tr. 30, finding no. 5)

Plaintiff further argues that the ALJ's consideration of her dementia/cognitive decline at later steps of the sequential evaluation process is fatally undermined by his misperception of those effects as being basically coterminous with plaintiff's alcohol abuse,

13

such that sustained abstinence from alcohol would result in the reversal of plaintiff's cognitive decline. Indeed, the ALJ did find that if plaintiff stopped abusing alcohol, her mental functioning would be only mildly impaired. (Tr. 32, 34) However, the undersigned finds no error in the ALJ's analysis, since the only evidence of more than mild functional limitation due to cognitive decline is Dr. Doineau's consultative evaluation, which in the ALJ's view was undermined by the fact that Dr. Doineau obtained test results and offered opinions as to plaintiff's functional ability during a time when plaintiff's chronic alcohol abuse was ongoing, despite plaintiff's report to the contrary. The ALJ thus found that "Dr. Doineau's opinion, based on her evaluation, could not and did not take into consideration the significant influence of alcohol consumption on the claimant's ability to function." (Tr. 34) The undersigned concludes that the dementia/cognitive decline assessed by Dr. Doineau as "probably secondary to chronic alcohol usage" (Tr. 880), which also left plaintiff markedly limited in her ability to maintain concentration, persistence, or pace and "absolutely not capable of managing disability funds" (Tr. 881), was not unreasonably viewed by the ALJ as indicative of plaintiff's functional limitations when considering her alcohol dependence, but not as indicative of enduring limitations in the absence of chronic alcohol usage.

Plaintiff next argues that the ALJ erred by misapplying the regulations which govern the determination of whether drug or alcohol addiction is a contributing factor material to the determination of disability. A 1996 amendment to the Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is

14

disabled." 42 U.S.C. § 423(d)(2)(C). The Commissioner's regulations implementing[3] this standard clearly require that the sequential evaluation process be followed in adjudicating disability before any consideration is given to whether drug addiction is the cause of such disability. 20 C.F.R. §§ 404.1535(a), 416.935(a). See also Williams v. Barnhart, 338 F.Supp.2d 849 (M.D. Tenn. 2004).

   The ALJ here followed these regulations in determining that plaintiff's combination of impairments including alcohol dependence was disabling, then analyzing whether plaintiff's combination of impairments would remain disabling if alcohol dependence were removed from the mix. In conducting this analysis, the ALJ must make his determination from the proof of disability which plaintiff bore the burden of producing, combined with the vocational proof which the SSA has the burden of producing once it is demonstrated that plaintiff cannot return to her past relevant work. It is not, as plaintiff seems to argue, the ALJ's burden to produce medical proof that plaintiff can perform the jobs identified by the vocational expert. (Docket Entry No. 18 at 26) Rather, the ALJ's step five evidentiary burden is borne by the production of vocational proof of jobs in the economy which plaintiff could perform in light of her demonstrated limitations. The ALJ's task in these cases, though often difficult, is not made impossible by the fact that the record fails to document any sustained period of abstinence. While plaintiff cites to an agency teletype

---

[3] Sections 404.1535 and 416.935 in fact predate the statutory amendment, but have continued to be applied in determining the Commissioner's duties when there is medical evidence of drug addiction or alcoholism, though the remainder of the regulations in that series dealing with drug addiction and alcoholism, §§ 404.1536-404.1541 and 416.936-416.941, have been superseded by the amendment. Jackson v. Barnhart, 60 Fed. Appx. 255, 256 n.1 (10th Cir. March 24, 2003)(unpublished).

15

concerning the difficulty with separating mental restrictions imposed by a separate impairment from the mental restrictions imposed by substance abuse, and the resulting direction that a finding of "not material" would be appropriate in cases where this task proves impossible, the undersigned does not view this instruction as applicable here, since the ALJ found no other severe mental impairments. Rather, the principal difficulty in this case is separating the restrictions resulting solely from plaintiff's physical impairment, her seizure disorder, from those resulting from this disorder as exacerbated by alcohol abuse. The agency teletype proceeds to instruct that in cases where no sustained period of abstinence appears from the record, the evidence of record may nonetheless allow for a projection of limitations if the substance abuse was stopped by a medical or psychological consultant. (Docket Entry No. 18-2 at 11)

On this record, particularly with respect to plaintiff's seizure disorder as treated by Dr. Johnson and Nurse Practitioner Peters, the undersigned is satisfied that even though no medical consultant opined as to the effect of plaintiff's seizures in the absence of substance abuse, substantial evidence supports the ALJ's projection of impairment severity and functional limitation in the absence of such abuse.[4] Dr. Johnson and Nurse Practitioner

---

[4] Compare Wilson v. Astrue, 2010 WL 2990857, at *3-4 (W.D. Wash. May 17, 2010), in which the court stated as follows:

> Pointing to "Question No. 27 of Emergency Teletype EM-96200 - in which the Commissioner directs disability examiners to not make a finding of materiality in those situations where a medical or psychological consultant cannot project what limitations would remain if drug or alcohol abuse was stopped - plaintiff argues the ALJ improperly made such a finding here. But, as explained in greater detail below, the substantial objective medical evidence in the record supports the ALJ's materiality finding, even if the above internal policy guideline was binding on this Court. *See Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000) (noting SSA's Hearing, Appeals

16

Case 3:09-cv-00892   Document 31   Filed 09/03/10   Page 16 of 20 PageID #: 199

Peters recorded that plaintiff had a history of multiple seizures per week while she was only partially compliant with her prescribed treatment of the anti-seizure medication Dilantin, and while she was abusing alcohol, which stood to interact with the Dilantin that she did manage to take, lower her threshold for resisting seizures, and in fact increase their frequency. (Tr. 620-23) Indeed, even with the level of impairment from seizures while abusing alcohol and foregoing prescribed treatment, plaintiff testified that the seizures she suffered at times while working housecleaning jobs for her family would only require her to "sit down and take a rest and then get back to it." (Tr. 916) This report is substantially at odds with counsel's description of the seizure pattern purportedly described by Dr. Johnson and Nurse Practitioner Peters, "[w]ith alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day," all occurring despite a sustained period of compliance with prescribed treatment. (Tr. 621; Docket Entry No. 18 at 25-26) In fact, plaintiff's longstanding seizure disorder, persisting at least since the age of twenty (Tr. 313), is not alleged to have precluded significant work activity until April 2003, when plaintiff was thirty-eight years old. Prior to that time, plaintiff was able to work and support herself despite her seizure disorder. Accordingly, the undersigned finds substantial evidentiary support for the ALJ's finding that, if plaintiff's alcohol dependence is not considered, she could have performed work at any level of exertion prior to February 1, 2007, and thereafter

---

and Litigation Law Manual, unlike Code of Federal Regulations, is strictly internal guidance tool, and, as such, does not carry force and effect of law). ... Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. ... The ALJ also may draw inferences "logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

a light level of exertion, so long as that work would allow for seizure precautions in the form of no exposure to hazards such as unprotected heights, hazardous equipment, machinery, uneven surfaces, climbing, and the like.

Finally, with regard to plaintiff's argument that her treating physician's opinion was discounted without any good reason being offered, the ALJ clearly explained his reasons for rejecting the opinion of Dr. Johnson and Nurse Practitioner Peters that plaintiff met the requirements of Listing 11.03, pertaining to seizures. (Tr. 620-23) At page nine of his decision, the ALJ stated as follows:

> Dr. Johnson and Ms. Peters opined that the claimant's seizure disorder met the requirements of 11.03 of the Listing of Impairments. They also observed that the claimant was not compliant with treatment by medications and that she had consumed alcohol, which lowered her seizure threshold. Other PCHC records demonstrate that, as part of her treatment, Ms. Peters told the claimant to stop consuming alcohol on several occasions. To satisfy 11.03, the claimant must have followed prescribed treatment. Also, a year earlier, Ms. Peters opined that the claimant could work albeit with restrictions. Thus, for those reasons, listing 11.03 has not been satisfied.

(Tr. 29) In fact, it is clear that these sources did not offer any opinion as to what plaintiff's seizure related limitations would be if she stopped drinking and came into compliance with her treatment regimen. They merely checked the box to indicate "nonconvulsive epilepsy" on a form prepared by counsel to include the Listing 11.03 criteria (e.g., "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment[,] [w]ith alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day"). Notwithstanding this check-box indication that such condition was met, Dr. Johnson and

18

Nurse Practitioner Peters proceeded to disclaim any such symptoms described there as occurring "in spite of at least 3 months of prescribed treatment" and in the absence of alcohol abuse. To the extent then that Dr. Johnson and Nurse Practitioner Peters opined that plaintiff met the requirements of Listing 11.03, the ALJ more than sufficiently explained his reasons for rejecting such an opinion.

In sum, the undersigned finds substantial evidence on the record as a whole to support the findings and decision of the SSA in this case.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 3rd day of September, 2010.

                                                     s/ John S. Bryant
                                                     JOHN S. BRYANT
                                                     UNITED STATES MAGISTRATE JUDGE